UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X

UNITED STATES OF AMERICA                        :

                                                :

                    -v.-                        :

                                                :          17 Cr. 434 (ARR)

JOSE OSVALDO MELENDEZ-ROJAS,                    :

        Defendant.                              :

--------------------------------------------------------- X

## SENTENCING MEMORANDUM FOR THE DEFENDANT JOSE OSVALDO MELENDEZ-ROJAS

John A. Diaz, Esq.
DIAZ & MOSKOWITZ, PLLC
225 Broadway, Suite 715
New York, New York 10007
(212) 227-8208



# DIAZ & MOSKOWITZ, PLLC

Attorneys at Law

**John A. Diaz, Esq.**          johnadiazlaw@gmail.com          **www.dmlawny.com**

| Garden City Office: | New York Office: |
|---|---|
| 1225 Franklin Avenue | 225 Broadway |
| Suite 325 | Suite 715 |
| Garden City, NY 11530 | New York, NY 10007 |
| (516) 686-6444 | (212) 227-8208 |
| (516) 686-6444 | Fax (212) 566-8165 |

August 6, 2021

<u>**VIA ECF**</u>

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   <u>**U.S. v. Jose Osvaldo Melendez-Rojas,**</u>
      **17 Cr. 434 (ARR)**

Dear Judge Ross:

This letter is respectfully submitted pursuant to Rule 32 of the Federal Rules of Criminal Procedure and sets forth several matters that Mr. Melendez-Rojas will raise in the determination of an appropriate sentence, serving the interests of justice and sentencing goals of 18 U.S.C. § 3553(a). Mr. Melendez-Rojas was arrested by Mexican authorities in February 2018, and has been in custody since that date. On March 13, 2020, Mr. Melendez-Rojas was found guilty following a jury trial to Counts 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 15, and 16 of an 18-count Superseding Indictment. Mr. Melendez-Rojas is extremely remorseful for his actions and participation in this crime. He is truly remorseful for the pain and trauma he caused the victims. As a result of Mr. Melendez-Rojas' unique background and personal characteristics, it is respectfully requested that the Court sentence him to 180 months imprisonment.

## <u>BACKGROUND</u>

Jose Osvaldo Melendez-Rojas was born on May 8, 1976, in Puebla, Mexico to his parents Francisco Melendez Perez and Isabel Rojas Torres.[1] Although Jose recalls that he had a good childhood, and was loved and supported by his mother and father, Jose and his five siblings grew up in extremely impoverished circumstances.[2] Jose's father worked in a textile factory in town

---

[1] PSR ¶ 199.
[2] PSR ¶ 200.

1

and his mother was a homemaker.[3]   Jose remembers that often, he and his siblings went without food and clothes and they even walked barefoot to school in the dirt because the family could not afford shoes.  They lived shacks that lacked electricity or running water and recalls eating tortillas dipped is sauce most nights for dinner.  Notably, when Jose was just 10 years old, he began working as a laborer in a textile factory an effort to financially assist his poverty-stricken family.[4]  Despite the struggles that Jose faced growing up in severe poverty, he always had the bonds of his large family.[5]  When  Jose's mother passed away in December 2019 due to diabetes complications, the family was devastated.  Throughout his childhood and to this day, Jose has financially assisted his parents in any way he could and after their mother passed, Jose continues to assist his aging father.[6]

Like many immigrants, Jose saw the United States as a place of opportunity.  He first came to the United States in 1999, leaving his family behind.  Jose came by himself to the Bronx because he knew of someone who was going to give him a good job.  For the next three years, Jose lived in the Bronx and New Jersey and worked in various settings to earn money to send back to his family.  He worked at a car wash, in a Korean and African market, and as a laborer.  Jose took any work he could find while he was in the U.S.  After three years, Jose voluntarily went back to Mexico because his mother had fallen ill and he wanted to be there for her to care and look after her.  For the next two to three years, Jose stayed in Mexico and took care of his family.

When Jose was approximately 25 years old, he returned to the United States, this time with his girlfriend, Engracia Lopez Barrera.  This relationship produced one child, a daughter who is currently 13 years old and lives with her mother.  Jose's mother was still sick when he returned to the U.S. and although he worked while he lived in Mexico, he was not making sufficient money to meet his family's needs.  In the United States, Jose worked again at the African market and sent as much money as he could back home.  Unfortunately, Jose and Engracia's relationship ended in 2007; however, he continued to provide financial support for his daughter until his arrest in this case and still maintains a civil relationship with Engracia.[7]  Jose is a warm and loving father to his daughter and always treated both his daughter and Engracia with respect.[8]

Jose stayed in the United States for the next three years and then returned to Mexico when his mother again became ill.  He stayed in Mexico for a year, working and taking care of his mother until her health issues subsided. Jose then returned to the United States for the next year and in 2011, went back to Mexico, where he resided until his arrest in this case.  While in Mexico for the past 10 years, Jose lived with his parents and worked as a gardener at local schools and other developments where he could find work to support his family.[9]  He also was on the Parent Council at his daughter's primary school and would coordinate events for the students.[10]   Jose also "arranged for the school to receive federal resources to improve the school, such as the construction of a computer room, a cafeteria, and other structures…"[11]

---

[3] PSR ¶ 199.
[4] PSR ¶ 200; *see also* Exhibit A – Letter from Francisco Melendez-Perez.
[5] *See* PSR ¶ 201.
[6] PSR ¶ 200.
[7] PSR ¶ 204.
[8] Exhibit B – Letter from Engracia Barrera Lopez.
[9] Exhibit A.
[10] *Id*; *see also* Exhibit C – Letter from Rosalia Saldana Flores.
[11] *Id*.

Jose Osvaldo Melendez-Rojas is a responsible and happy family man who works hard to support his family.[12]  When his niece, Graciela Melendez Velazquez came to him after her marriage had failed and discovering she was pregnant while still a student, he provided her "advice and guidance" and she was able to finish her studies and begin her career which helped improve her and her daughter's lives.[13]  Jose believes in the importance of education and, although he was unable to finish his studies, has encouraged his family members to work hard in school and earn their degrees.[14]  Jose is a good person and kind person who cares for all those around him.[15]

## OBJECTIONS TO THE PSR

Mr. Melendez-Rojas is extremely remorseful for participating in the prostitution of the victims in this case. He is apologetic to the victims and, as the father of a young woman, is deeply ashamed of his actions.  Although Mr. Melendez-Rojas accepts responsibility for his actions in the prostitution of the victims, he denies that he ever participated in specific instances of rape, assaults, kidnapping, and forced abortions of the victims and respectfully objects to the portions of the PSR that reference his participation is such acts. Specifically, Mr. Melendez-Rojas objects to paragraphs 20, 21, 31, 34, 35, 36, 37, 38, 39, and 40 of the PSR.

## THE APPROPRIATE SENTENCE

The Court is required to consider the factors set forth in Title 18 U.S.C. § 3553(a) and to impose a sentence that is both reasonable and "sufficient, but not greater than necessary, to comply with the purposes" reflected by the subsections of § 3553(a).  Mr. Melendez-Rojas is remorseful for his conduct and is apologetic for his participation in these crimes.  After a review of his life and circumstances, a sentence of 180 months is appropriate, reasonable, and thus warranted in this case.

After applying the Grouping rules under U.S.S.G. § 3D1.4, the Probation Department has calculated Mr. Melendez-Rojas' Combined Adjusted Offense Level as 44.  Pursuant to Chapter 5, Part A (comment n.2), where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43, and therefore, Mr. Melendez-Rojas' Total Offense Level is 43.  With a Total Criminal History Score of 0, Mr. Melendez-Rojas' Guidelines Range is life.

**1) The nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 3553 (a)(1));**

**a.  Nature and circumstances of the offense:**

The severity of the acts attributable to the criminal enterprise Mr. Melendez-Rojas was involved with cannot be overstated.  Human trafficking is a global problem with widespread impact on many people.  However, Mr. Melendez-Rojas' role, when compared to his co-conspirators in this case, was limited.

---

[12] *See id*; *see also* Exhibit D – Letter from Graciela Melendez Velazquez; Exhibit E – Letter from Liset Melendez Velazquez; Exhibit F – Letter from Aldair Esau Ramirez.
[13] Exhibit D.
[14] Exhibit E.
[15] Exhibit G – Letter from Pedro Rojas Torres.

Without diminishing the severity of his acts, Mr. Melendez-Rojas is less culpable than most of his co-defendants. At the time he became involved in this conspiracy, Mr. Melendez-Rojas and was under immense pressure from a lack of finances to support his large tight family and their matriarch was in poor health. He did not know where his next meal was coming from and he did not know how he was going to afford his mother's treatment and care. Although he worked from the time he was 10 years old, he never earned enough money to fully support himself and his family. Additionally, there was testimony at the trial that there had been a normalization of prostitution in his home town of Tenancingo. Eventually, he was offered an opportunity to make substantially more money than he had ever made before. As a result, Mr. Melendez-Rojas become involved in the instant conspiracy with other members of his family.

Maria Rosalba clearly testified at the trial that Mr. Melendez-Rojas forced her into prostitution for the fifteen months that she knew him. She was also clear that they behaved as a couple by going to the beach and attending family weddings. Her father was abusive and her family was poor and did not support her, so she admittedly did not have many other options. She was also aware that she could make a lot of money in prostitution. Mr. Melendez-Rojas sent money earned from the criminal enterprise to her family back in Mexico and Maria Rosalba even continued to send Mr. Melendez-Rojas money when he returned to Mexico and she remained in the United States. When Maria Rosalba made the decision to leave prostitution, Mr. Melendez-Rojas never harmed nor attempted to harm her or her family and she had no further contact with him nor any of the other co-defendants after she left. Maria Rosalba wants to remain in the United States and she testified that she is happy and has made her life and has everything that she wanted.

After considering Mr. Melendez-Rojas' background, personal characteristics, and limited role in the conspiracy, it is clear that a sentence of 180 months imprisonment would be "sufficient, but not greater than necessary" to comply with the sentencing goals of 18 U.S.C. § 3553(a)(2).

**b. History and characteristics of the defendant:**

Mr. Melendez-Rojas grew up in debilitating poverty. He began working as a day laborer when he was just 10 years old in an effort to assist his family financially. However, the wages he was receiving in Mexico still barely covered the daily necessities for the family. When Mr. Melendez-Rojas was a teenager, he made the decision to come to the United States in the hopes of obtaining gainful employment. Over the next 10 years, Mr. Melendez-Rojas moved back and forth between Mexico and the United States to care for his family physically and financially.

Since returning to Mexico approximately 10 years ago, Mr. Melendez-Rojas has lived a crime-free life and there is no present indication of recidivism. Mr. Melendez-Rojas came to this country for the same reason so many have before him, to earn a living to provide his family with a better life. Unfortunately, he became involved in illegal activity in the hopes of attaining prosperity and is now suffering the consequences for his poor judgment.

Further, since his incarceration on this matter, Mr. Melendez-Rojas has been a model inmate. He currently works as an orderly at the MDC and received an outstanding work performance rating in June, 2021. In fact, he received a bonus for his exceptional work and the BOP writes that "Jose does a full days work and has mastered his job, he doesn't make mistakes…"

and is always working to perform his job "better, safer and more efficient."[16]  "Inmate Melendez-Rojas gets outstanding evaluations every month…[and] does an outstanding job while assigned to unit orderly."[17]

Mr. Melendez-Rojas' personal history and characteristics paved the way for his involvement in the instant offense.  While his background in no way excuses his involvement, nor in any way diminishes its seriousness, it does explain his actions and provides substantial mitigation in determining an appropriate sentence that serves the ends of justice.

**2) The need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(A)-(C));**

Mr. Melendez-Rojas appreciates the serious nature of his crime and is very remorseful for his conduct.  Sentencing Mr. Melendez-Rojas to 180 months imprisonment will provide sufficient punishment for the offense and protect the public from further crimes of the defendant.

In addition to the sentence he receives, Mr. Melendez-Rojas is also aware that, due to his immigration status, he faces a significant likelihood, if not absolute, of enduring deportation proceedings.  With the very small risk of Mr. Melendez-Rojas being allowed to re-join this country's general population, the need to protect the general public from further crimes is significantly low.  Additionally, the Probation Department currently estimates that it costs the taxpayers approximately $38,000 per year to house an inmate in a BOP facility.  Counsel submits that it would be a waste of taxpayer money to house Mr. Melendez-Rojas for longer than 180 months when he is ultimately going to be deported to Mexico.

Further, the relative harshness of Mr. Melendez-Rojas' pre-sentence confinement bears on sentencing insofar as one of the purposes of sentencing is to afford just punishment for the offense and respect for the law.  For the last two and a half years, Mr. Melendez-Rojas has been confined in pre-trial detention at MDC Brooklyn, a jail that is not designed for long-term stays.  Even under the best of circumstances, inmates' movements are severely restricted at all times and they have little opportunity to participate in social programs, limited access to personal development programs, exercise, physical training or recreation, and almost no opportunities to be outdoors.

The last year, of course, has presented the worst of conditions.  The COVID-19 crisis has hit prisons and jails throughout the country disproportionally to the rest of the population.  In response, the BOP has imposed draconian restrictions on inmates.  Beginning in March 2020, the BOP implemented phase 2 of their response to the pandemic.  Social and legal visits were suspended for 30 days and inmate movement was restricted.  Since that time, Mr. Melendez-Rojas' unit has often been in lockdown with little communication with family.[18]  Mr. Melendez-Rojas has also had to endure the constant anxiety of possibly catching the coronavirus.

---

[16] Exhibit H – BOP Work Performance Rating.
[17] *Id.*
[18] *See* Kevin Johnson, *Federal prison officials order system-wide lockdown in bid to limit coronavirus spread*, USA Today (Mar. 31, 2020) (available at: https://bit.ly/3erMUHx).

Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition in measuring a just sentence.[19] The same logic applies here. "A day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing."[20] Even pre-Booker, the Second Circuit held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures,"[21] Similarly, sentencing judges have based downward departures on findings of unduly harsh conditions of pre-trial confinement[22]. Post-Booker, concerns that authorized departures from the sentencing guidelines when they were considered mandatory may now justify non-guidelines sentences pursuant to Title 18, United States Code, section 3553(a).

Over the last year, courts in this district have repeatedly found that unprecedented and harsh conditions of confinement due to the COVID-19 pandemic warrant downward variances from the Sentencing Guidelines.[23] Specifically, in *United States v. Aracena De Jesus*, 20 Cr. 19,

---

[19] *See, e.g.*, *United States v. Carty*, 264 F.3d 191, 196–97 (2d Cir. 2001) (holding that that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures," and vacating and remanding the defendant's sentence "so that the district court [could] reconsider the defendant's request for a downward departure, and do so in the light of this holding"); *United States v. Sanpedro*, 352 F. App'x 482, 486 (2d Cir. 2009) (noting that "[i]n imposing the sentence it did, the district court considered . . . [among other factors,] the harsh conditions of [the defendant's] confinement at Combita," in Columbia where he was detained before being extradited to the United States); *United States v. Salvador*, No. 98 Cr. 484 (LMM), 2006 WL 2034637, at *4 (S.D.N.Y. July 19, 2006) (holding that the defendant's pre-sentence conditions while "incarcerated in the Dominican Republic, awaiting extradition to the United States . . . warrant a downward departure"); *United States v. Torres*, No. 01 Cr. 1078 (LMM), 2005 WL 2087818, at *2 (S.D.N.Y. Aug. 30, 2005) ("depart[ing] downward, by 1 level, because of the harsh conditions of defendant's pretrial detention").

[20] Opinion and Order at 7, *United States v. Ramon Lizardi*, 11 Cr. 1032-55 (PAE) (Oct. 9, 2020). *See also* Def. Mem. at 6; *United States v. Rodriguez*, No. 00 Cr. 761-2 (JSR), 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) ("The pandemic, aside from posing a threat to [a defendant's] health, has made [ a defendant's] incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal." (citation omitted)); *United States v. Salemo*, No. 11 Cr. 0065-01 (JSR), 2020 WL 2521555, at *3 (S.D.N.Y. May 17, 2020) ("noting that the BOP has taken a number of steps to mitigate the spread of the virus in federal prisons . . . [including] restrictions on visitors, restrictions on gatherings . . . [and] lockdowns lasting at least 14 days"); *United States v. Smalls*, No. 20 Cr. 126 (LTS), 2020 WL 1866034, at *2 (S.D.N.Y. Apr. 14, 2020) (noting that the "BOP has instituted a mandatory 14-day quarantine lockdown of all inmates across the BOP system").

[21] *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (per curiam), because harsh conditions of confinement could be regarded as a mitigating factor pursuant to U.S.S.G. §5K2.0. Id. (internal citation omitted.)

[22] *See, e.g.*, *United States v. Francis*, 129 F.2d 612 (S.D.N.Y. 2001) (Patterson, J.) (Departing one level because of harsh conditions of pre-trial confinement endured by illegal reentry defendant for 13 months at Hudson County Correctional Center).

[23] *See United States v. Capalbo*, 02 Cr 1237 (Preska, J.)(in a Davis re-sentencing proceeding, sentencing the defendant to Time Served in light of defendant's health conditions and COVID [Dkt No. 482]); *United States v. Carillo-Berber*, 18 Cr 703 (Crotty, J.)(court considered conditions of confinement in departing downward[Dkt. No. 28]); *United States v. Rivera*, 16 Cr 66 (Torres, J.) (Court imposed sentence of three months despite 5-11 month guidelines and stated that it "would be remiss if it failed to consider that being detained at the MCC for three months in ordinary times is very different from being detained for three months during the COVID-19 pandemic."); *United States v. Pierson*, 14 Cr 855 (Swain, J.)(court considered conditions of confinement at MDC during pandemic as one of the reasons for imposed Time Served); *United States v. Morgan*, 19 Cr 209 (Berman, J.)(Court imposed sentence less than one-half of the low end of the guidelines, based in part on conditions at MDC during pandemic); *United States v. Cirino*, 19 Cr 323(Rakoff, J.) (Court imposed sentence of 10 months despite 57-71 month guidelines and

Judge Engelmayer stated:

> Finally, I am mindful… that you have served most of your time in prison so far
> during the worst pandemic in this country during the past 100 years. I'm mindful
> that you may have contracted COVID-19 while in prison. I'm mindful that your
> experience in prison as a result of the pandemic, the preceding lockdown, the
> ensuing lockdown, and your own illness was frightful. Prison is supposed to be
> punishment, but it is not supposed to be trauma of that nature or close.[24]
>
> Bottom line, your time in the MCC was way harder than anyone intended when you
> were detained following your arrest. Any mature system of justice, any thoughtful
> judge in imposing the reasonable sentence here would have to recognize the
> unexpected and regrettable ardors that you experienced since your arrest in
> December.[25]

In addition to the COVID pandemic that occurred in 2020, Mr. Melendez-Rojas sustained
horrific living conditions while at the MDC in 2019 where it was reported that the inmates had
been living in freezing temperatures with no hot meal and inadequate clothing - conditions that
rival the worst refugee camp in the world.[26]  The inmates were not given blankets or adequate
clothing to keep warm.  They were not given food for an entire day and when they finally did
receive a meal, they were given cold sandwiches.  Commissary was also closed so Mr. Melendez-
Rojas could not even buy himself something to eat.  Additionally, the toilets in the cells are electric
so the inmates could not even go to the bathroom.  Counsel submits that the ongoing peril to an
inmate such as Mr. Melendez-Rojas, along with the unforeseeable and harsh conditions of
confinement which he has had to endure, provide a further justification for this Court to depart
downward and sentence Mr. Melendez-Rojas to 180 months imprisonment.

---

stated, "[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that
ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in
the federal prisons."); United States v. Morgan, 19 Cr. 209 (S.D.N.Y. May 5, 2020) (Berman, J.) (Court imposed
sentence of fourteen months despite 41-51 month guidelines and observed that, even before the pandemic, the MCC
"housed basically improperly persons who are detained").

[24] *Aracena De Jesus,* Sent. Tr. at 36:10-18

[25] *Id.* at 37: 6-11.

[26] Annie Correal, *No Heat for Days at a Jail in Brooklyn Where Hundreds of Inmates are Sick and 'Frantic,'* N.Y.
TIMES, Feb. 1, 2019, https://www.nytimes.com/2019/02/01/nyregion/mdc-brooklyn-jail-heat.html; *see also* Annie
Correal and Joseph Goldstein,  *'It's Cold as Hell': Inside a Brooklyn Jail's Weeklong Collapse*,  N.Y. TIMES, Feb. 9,
2019, https://www.nytimes.com/2019/02/09/nyregion/brooklyn-jail-no-heat-inmates.html.

## **CONCLUSION**

Mr. Melendez-Rojas understands the seriousness of his offense and is deeply apologetic for his actions and remains especially remorseful to the Court.  When Mr. Melendez-Rojas' involvement in this offense is viewed against the backdrop of his personal history and characteristics and substantial assistance to the Government, it is clear that the proposed sentence of 180 months imprisonment is both reasonable and appropriate.  Mr. Melendez-Rojas respectfully reserves the right to raise additional issues at the time of sentencing.  The Court's time and consideration of this submission are greatly appreciated.

Respectfully submitted,

/s/

John A. Diaz, Esq.

cc:     All counsel (*via email*)